1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11  PACIFIC GAS AND ELECTRIC
    COMPANY, SOUTHERN CALIFORNIA
12  EDISON COMPANY, CALIFORNIA
    ELECTRICITY OVERSIGHT BOARD
13                                        2:06-CV-0559-MCE-KJM
            Plaintiffs,
14
        v.                                MEMORANDUM AND ORDER
15

16  ARIZONA ELECTRIC POWER
    COOPERATIVE, INC., CITY OF
17  ANAHEIM, CITY OF AZUSA, CITY
    OF BANNING, CITY OF BURBANK,
18  CITY OF GLENDALE, CITY OF LOS
    ANGELES, CITY OF PASADENA,
19  CITY OF RIVERSIDE, CITY OF
    SANTA CLARA, CITY OF SEATTLE,
20  CITY OF VERNON, EUGENE WATER
    AND ELECTRIC BOARD, LOS
21  ANGELES DEPARTMENT OF WATER
    AND POWER, MODESTO IRRIGATION
22  DISTRICT, NORTHERN CALIFORNIA
    POWER AGENCY, PUBLIC UTILITY
23  DISTRICT NO. 2 OF GRANT
    COUNTY, SACRAMENTO MUNICIPAL
24  UTILITY DISTRICT, SALT RIVER
    PROJECT AGRICULTURAL
25  IMPROVEMENT AND POWER
    DISTRICT, TURLOCK IRRIGATION
26  DISTRICT,

27          Defendants.
    _____
28

1

1   SAN DIEGO GAS & ELECTRIC
    COMPANY,
2
              Plaintiff,
3                                              2:06-CV-0592-MCE-KJM
                                               RELATED CASE
4
5        v.

6   ARIZONA ELECTRIC POWER
    COOPERATIVE, INC., CITY OF
7   ANAHEIM, CITY OF AZUSA, CITY
    OF BANNING, CITY OF BURBANK,
8   CITY OF GLENDALE, CITY OF LOS
    ANGELES, LOS ANGELES
9   DEPARTMENT OF WATER AND POWER,
    CITY OF PASADENA, CITY OF
10  RIVERSIDE, CITY OF SANTA
    CLARA, CITY OF SEATTLE, CITY
11  OF VERNON, EUGENE WATER AND
    ELECTRIC BOARD, MODESTO
12  IRRIGATION DISTRICT, NORTHERN
    CALIFORNIA POWER AGENCY,
13  PUBLIC UTILITY NO. 2 OF GRANT
    COUNTY, SACRAMENTO MUNICIPAL
14  UTILITY DISTRICT, SALT RIVER
    PROJECT AGRICULTURAL
15  IMPROVEMENT AND POWER
    DISTRICT, and TURLOCK
16  IRRIGATION DISTRICT,

17
              Defendants.
18
19  _____

20
                        ----oo0oo----
21

22       Before the Court are numerous motions seeking dismissal of

23  the two above captioned cases.  The lead case, civil case no.

24  2:06-cv-0559, was filed on March 16, 2006, and its companion

25  case, civil case no. 2:06-cv-0592, was filed five (5) days later

26  on March 21, 2006.  These actions involve identical Defendants

27  and are based on same or similar allegations, same or similar

28  events and pose same or similar questions of fact and law.

                              2

1   Due to this marked similarity, the Court ordered the cases

2   related.  *See* Civ. Case No. 2:06-cv-0559, Docket 15, March 28,

3   2006.  The Motions to Dismiss filed in these actions seek

4   dismissal through virtually identical mechanisms.  Given the

5   likeness of the Parties, the underlying factual predicate, and

6   the bases of the motions filed in both actions, the Court shall

7   herein dispose of all pending motions in both the lead case as

8   well as the member case (collectively, the "Action") as set forth

9   below.

10

11                              **BACKGROUND**

12

13       The present Action was brought by Pacific Gas & Electric

14   ("PG&E"), Southern California Edison Company ("SCEC"), the

15   California Electricity Oversight Board ("CEOB") and San Diego Gas

16   & Electric ("SDGE") (collectively, "Plaintiffs") against twenty

17   separate non-public government entities including Arizona

18   Electric Power Cooperative, Inc. ("Arizona"), City of Anaheim

19   ("Anaheim"); City of Azusa ("Azusa"); City of Banning

20   ("Banning"); City of Burbank ("Burbank"); City of Glendale

21   ("Glendale"); City of Los Angeles ("Los Angeles"); City of

22   Pasadena ("Pasadena"); City of Riverside ("Riverside"); City of

23   Santa Clara ("Santa Clara"); City of Seattle ("Seattle"); City of

24   Vernon ("Vernon"); Eugene Water and Electric Board ("Eugene");

25   Los Angeles Department of Water and Power ("LA Water"); Modesto

26   Irrigation District ("Modesto"); Northern California Power Agency

27   ("NCPA"); Public Utility District No. 2 of Grant County

28   ("Grant"); Sacramento Municipal Utility District ("SMUD"); Salt

                                    3

1  River Project Agricultural Improvement and Power District ("Salt

2  River"); and Turlock Irrigation District ("Turlock")

3  (collectively, "Defendants").[1]  Plaintiffs are seeking damages and

4  declaratory relief for sums allegedly owed as a result of

5  overpayment to Defendants for wholesale electricity and ancillary

6  services ("Energy") between May 1, 2000 and June 20, 2001.

7       Plaintiffs purchase Energy from a number of sources and

8  resell that Energy to consumers at retail prices.  The California

9  wholesale markets are operated by the California Independent

10  System Operator Corporation ("ISO") and California Power Exchange

11  Corporation ("PX") under tariffs filed with and approved by the

12  Federal Energy Regulatory Commission ("FERC").  The ISO and PX

13  are public utilities under the Federal Power Act ("FPA") and are,

14  therefore, subject to FERC's jurisdiction.

15       The ISO is generally the entity responsible for operating

16  and maintaining California's electric transmission grid,

17  including resolving transmission congestion and purchasing

18  electric power to maintain system reliability.  The PX acts as a

19  clearinghouse for daily and hourly markets and submitted

20  schedules of electric power to the ISO in which scheduled

21  generation for the following day equaled scheduled demand.

22  Pursuant to the PX Tariff, sellers in the PX market submitted

23  offers to sell electric power, and purchasers submitted demand

24  bids for the quantity of electric power that they wanted to buy.

25  ///

26

27       [1]Eugene and Salt River were voluntarily dismissed from this
   Action with prejudice on July 12, 2006 and May 12, 2006,
28  respectively.

4

The PX conducted day-ahead and same-day auctions that allowed parties to adjust their hourly commitments based on changing needs and availability.  Under its tariff, the PX was charged with responsibility for, among other things, settling energy trades between PX market participants and preparing and distributing to PX market participants invoices reflecting the amounts payable and receivable by them in connection with their trading through the PX.

In general, the PX determined, for each hour in each of the markets that it operated, a single market-clearing price that all electric power suppliers were paid under the auction provisions of the PX tariff.  The PX matched offers to buy and sell beginning with the lowest-priced bids and continuing up to the highest-priced bids until the amount of power accepted matched the amount sought by purchasers at that price.  The price of the last, and therefore the highest-priced, accepted bid set the price for the entire market.  All sellers of electric power in a given auction received the same market-clearing price, even if the seller had offered to sell at a lower price.

In order to obtain sufficient electric power to maintain reliability of California's electric grid, the ISO at times was required to procure electric power through procedures other than its regular auction.  During the period at issue, the ISO was often forced to solicit such electric power, known as "out-of-market" or "OOM" electric power, to meet California's demand for electric power.

///

///

The ISO Tariff permitted the ISO to solicit this electric power through extraordinary means, such as seeking Energy from OOM electric power marketers and generators, including the Defendants.  These purchases were subject to certain price caps applicable in the ISO markets, which price caps varied during the relevant period and were intended to prevent price gouging. Despite these price caps, suppliers of OOM electric power regularly demanded more than the FERC-approved price cap for such sales to the ISO.  In order to maintain the reliability of California's electric grid, the ISO procured the electric power at whatever price it was offered, even if that price exceeded its price caps, and then charged market participants, including the Plaintiffs, herein, for the Energy purchased.

Plaintiffs allege that the ISO and PX Tariffs filed with FERC contained the only terms and conditions, including the pricing formulas, upon which transactions in the ISO and the PX could lawfully be conducted.  Further, the Plaintiffs aver that Defendants voluntary sale of Energy into the ISO and PX markets render them charged with knowledge and acceptance of those terms and conditions giving rise to contract remedies.  This assertion is heavily disputed by Defendants.  As additional support for the foregoing, Plaintiffs contend that the PX tariff required all PX market participants to execute a PX Participation Agreement. That Agreement provided, *inter alia*, that the PX market participant "will abide by and will perform all of the obligations under the PX tariff in respect of all matters set forth therein including, without limitation, all matters relating to the trading of Energy by it through the PX market."

PX Tariff Appendix A, Participation Agreement, § II(B).  The PX Participation Agreement further provided that "[t]he PX Tariff is incorporated herein and made a part hereof."  PX Tariff Appendix A, Participation Agreement, § 8.

Similarly, the ISO Tariff contemplated that each market participant, including the Defendants, would execute an ISO Scheduling Coordinator Agreement.  That Agreement was prescribed by the ISO tariff and provided, *inter alia*, that the ISO Scheduling Coordinator "will abide by, and will perform all of the obligations under the ISO Tariff placed on Scheduling Coordinators in respect of all matters set forth therein including, without limitation, all matters relating to the scheduling of Energy and Ancillary Services on the ISO controlled grid, ... [and] billing and payments ...."  ISO Tariff Appendix B, Scheduling Coordinator Agreement, § 2(B).  The Scheduling Coordinator Agreement further provided that "[t]he ISO Tariff is incorporated herein and made a part hereof."  ISO Tariff Appendix B, Scheduling Coordinator Agreement, § 8.

Beginning in May 2000, the prices demanded by sellers in the ISO and PX markets rose dramatically and sellers continued to demand those unprecedented prices for over a year.  As a result of the auction provisions of the ISO and PX Tariffs, these extremely high prices were charged by all Energy sellers in the markets, even if individual sellers had offered to sell their power in the auctions at lower prices.

As a result of these unprecedented prices, SDG&E filed a complaint with FERC under the FPA against Energy sellers subject to FERC's jurisdiction.  August 2, 2000, FERC Docket No. EL00-95.

PG&E, SCE, and the EOB intervened on August 14, 2000.  In that proceeding, the complaining parties requested that FERC investigate the justness, reasonableness, and lawfulness of rates being charged in the California ISO and PX markets and that FERC order refunds to the extent that FERC determined that sellers had charged unjust, unreasonable, or otherwise unlawful rates.

Following the foregoing proceeding, FERC immediately initiated an investigation into the pricing charged in the wholesale Energy markets.  In a November 1, 2000, Order, FERC found that the California market structure and rates were seriously "flawed" and proposed fundamental modifications to the wholesale market. 93 FERC ¶ 61,121, at 61,370 (2000).

On December 15, 2000, FERC issued an order eliminating the requirement that the Plaintiffs purchase all of their needed electric power through the PX.  The Order included proposed price mitigation measures and refund liability of public utility sellers.  93 FERC ¶ 61,294, at 61,997 (2000).  As a result of its findings, FERC also terminated the PX wholesale rate schedule and outlined a complex web of mitigation measures.  *Id.* at 61,997. Specifically, the Commission proposed to limit the single-price auction by refunding prices in excess of a "break-point" price. *Id.* at 61,983.

The power crisis ultimately ended on June 19, 2001, when FERC imposed "must offer" requirements on electric power generators prohibiting them from withholding generation, and imposed price caps on wholesale sellers of electric power across all western states effective June 21, 2001 ("June 19, 2001, Order").

*San Diego Gas & Electric Co., et al.*, 95 FERC ¶ 61,418 at 62,558, 62,569 (2001).

On July 25, 2001, FERC ordered both public and non-public utilities to refund those sums charged in excess of the price it had deemed to be just and reasonable for the period beginning October 2, 2000, and ending June 20, 2001 ("Refund Period").  96 FERC P 61,120, at 61,499 (2001) ("July Order").  This Order caused much upheaval as it directed non-public utilities that had universally been deemed outside FERC's jurisdiction to pay refunds for the Refund Period.  Not surprisingly, the non-public utilities sought review of FERC's July Order from the Ninth Circuit Court of Appeal.  *See Bonneville Power Admin. v. FERC*, 422 F.3d 908, 913 (9th Cir. 2005).

The *Bonneville* Court unanimously concluded that FERC exceeded its jurisdiction when it ordered non-public utilities that sold Energy into the California market during the relevant period to pay refunds.  The Ninth Circuit explained that FERC derives its refund authority from the FPA and specifically from Section 201(f) thereof.  *Id.* at 915.  The court further clarified that governmental entities (non-public utilities), like Defendants herein, are not subject to the provisions of subchapter II of the FPA unless otherwise specifically provided. *Id.*  Accordingly, the court remanded the action for further proceedings.

///

///

///

///

9

**STANDARD**

Federal Courts are presumptively without jurisdiction over civil actions, and the burden of establishing the contrary rests upon the party asserting jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994). Lack of subject matter jurisdiction is never waived and may be raised by either party or the court at any time. *Attorneys Trust v. Videotape Computer Products, Inc.*, 93 F.3d. 593, 594-95 (9th Cir. 1996). Lack of subject matter jurisdiction may be raised by the district court *sua sponte*: "Nothing is to be more jealously guarded by a court than its jurisdiction." *In re Mooney*, 841 F.2d. 1003, 1006 (9th Cir. 1988).

In moving to dismiss for lack of subject matter jurisdiction pursuant to Rule 12 (b)(1), the challenging party may either make a facial attack on the allegations of jurisdiction contained in the complaint or can instead take issue with subject matter jurisdiction on a factual basis. *Thornhill Publ'g Co. v. Gen. Tel. & Elect. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).

If the motion constitutes a facial attack, the Court must consider the factual allegations of the complaint to be true. *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3rd Cir. 1977). If the motion constitutes a factual attack, however, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Thornhill*, 594 F.2d at 733.

If the Court grants a motion to dismiss a complaint, it must then decide whether to grant leave to amend.  Generally, leave to amend should be denied only if it is clear that the deficiencies of the complaint cannot be cured by amendment.  *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980).

**ANALYSIS**

**I.    Subject Matter Jurisdiction**

Plaintiffs seek to invoke federal question jurisdiction based on 28 U.S.C. § 1331.  Specifically, paragraph 1 of PG&E's Complaint provides as follows:

> Plaintiffs' claims require resolution of a disputed and substantial issue of federal law in that plaintiffs' claims arise out of defendants' sales of electric power in wholesale electricity markets that are within the Federal Energy Regulatory Commission's ("FERC") exclusive regulatory jurisdiction, and plaintiffs are suing to recover for defendants' breaches of their contractual obligations contained in tariffs filed with and regulated by FERC.

*See* PG&E Complaint, ¶ 1; *see also* SDG&E Complaint, ¶ 1. Plaintiffs, in their papers, go on to argue that while this case seeks to interpret what is essentially a state law matter rather than a federal matter, the Supreme Court has "recognized ... that in certain cases federal question jurisdiction will [also] lie over state-law claims" that require the resolution of a disputed and substantial issue of federal law.  *See* Plf.s' Opp'n., p. 47 (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 125 S. Ct 2363, 2366-67 (2005)).

11

More precisely, Plaintiffs salient contention is that subject matter jurisdiction exists in the present action as the federal ISO and PX Tariffs filed with FERC contained the only terms and conditions, including the pricing formulas, upon which transactions in the ISO and the PX could lawfully be conducted. Accordingly, the interpretation of those federal tariffs will be necessary to assess the merits of Plaintiffs' claims.  Further, Plaintiffs aver that Defendants voluntary sale of Energy into the ISO and PX markets render them charged with knowledge and acceptance of those terms and conditions giving rise to contract remedies under federal law.  Defendants controvert Plaintiffs' allegations by clarifying that Plaintiffs' claims do not truly arise under a federal statute nor is there exclusive federal jurisdiction over the subject matter.

As noted above, district courts are courts of limited jurisdiction.  They possess only that power authorized by the United States Constitution and statute.  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 125 S. Ct. 2611, 2616 (2005) (internal quotation marks and citation omitted).  As a general matter, federal courts have subject matter jurisdiction over civil actions "arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.[2]  In order to be heard in this forum, Plaintiffs must satisfy the Court that jurisdiction exists.

///

---

[2]To the extent jurisdiction could be based on 28 U.S.C. § 1332, the Court shall address that issue in Section II.C. of this Order.

A.    **Arising Under Federal Jurisdiction**

As an initial matter, the Parties and the Court agree that this case does not present a federal question of the first kind; namely one created under federal law.  Rather, this is a purely state based contract action implicating certain language contained in a federal tariff.  Plaintiffs seek to persuade the Court that this chiefly federal issue is merely played out against the backdrop of a state law contract claim.  Defendants, predictably, claim the federal tariffs, while admittedly crafted pursuant to federal law, play but a bit role in an entirely state law contract action.  In fact, this case poses the "litigation-provoking problem" of a federal issue embedded in a state-created cause of action.  *See Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 809-10 (1986).  More precisely, the question before this Court is whether the incorporation by reference of federal regulations into a purely state law contract is sufficient to confer federal subject matter jurisdiction.  *See* 28 U.S.C. § 1331.

As a general matter, the Supreme Court has explained that the "vast majority" of cases brought under the federal-question jurisdiction of the federal courts are those in which federal law creates the cause of action.  *Merrell Dow*, 478 U.S. at 808.  That said, the Court has nonetheless recognized a case may arise under federal law "where the vindication of a right under state law necessarily turned on some construction of federal law."  *Id.* (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 9 (1983).

The cases that instruct the resolution of this jurisdictional quandary begin with the seminal case *Merrell Dow* adjudged in 1986.  There, the complainants alleged that the misbranding of Benedictin resulted in pregnant women ingesting the drug which caused birth defects to their children. Plaintiffs sought redress on grounds of negligence, breach of warranty, strict liability, fraud, and gross negligence.  As part of their cause of action, however, plaintiffs alleged the misbranding, in violation of the Federal Food, Drug, and Cosmetic Act ("FDCA"), was negligence per se.  Defendants sought to have the case heard in a federal forum based on the existence of a federal issue embedded in the state law claims.  The Supreme Court concluded that federal jurisdiction was lacking.  In explaining its' finding, the Supreme Court stated that

> "a complaint alleging a violation of a federal statute
> as an element of a state cause of action, when Congress
> has determined that there should be no private, federal
> cause of action for the violation, does not state a
> claim 'arising under the Constitution, laws, or
> treaties of the United States.'"

*Merrell Dow*, 478 U.S. at 817.

The foregoing holding had been interpreted by some courts as standing for the proposition that absent a private right of action, federal jurisdiction cannot exist.  In fact, that reading was later disapproved by the Court in a case entitled *Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S 308, 125 S. Ct. 2363, 162 L. Ed. 2d 257 (2005).  There, petitioner Grable brought a state quiet title action, claiming the respondent's title to a piece of land was invalid because the Internal Revenue Service had improperly noticed a tax seizure under 26 U.S.C. § 6335.

14

In upholding the lower court's determination that federal question jurisdiction did, in fact, exist, the Supreme Court wrote:

> [W]hether Grable was given notice within the meaning of the federal statute is thus an essential element of its quiet title claim, and the meaning of the federal statute is actually in dispute; it appears to be the only legal or factual issue contested in the case. The meaning of the federal tax provision is an important issue of federal law that sensibly belongs in a federal court.

*Grable*, 545 U.S. at 314.  Significantly, the fact that the federal statute in *Grable* did not create a private cause of action was not controlling.  In discussing the issue, the Court explained that *Merrell Dow* should be read in its entirety as treating the absence of a federal private right of action as "evidence relevant to, but not dispositive of, the sensitive judgments about congressional intent that § 1331 requires."  *Id.* at 308.  The Court went on to explain that the absence of a private right of action should be considered an indicator of substantiality of the federal issue at stake and, more importantly, as an indicator of congressional intent regarding the scope of jurisdiction to be exercised under § 1331.  *Id.*  The *Grable* Court further found the missing cause of a private right of action not as "a missing federal door key, always required, but as a missing welcome mat."  *Id.*

Most recently, the Court considered a case rather on point with the case presently before this Court; *Empire HealthChoice Assur., Inc. v. McVeigh,* 126 S. Ct. 2121 (2006).

///

///

15

*Empire* involved a dispute about the meaning of terms in a federal health insurance contract between a federal agency and a private insurance carrier that set forth the details of a federal health insurance program created by federal statute and covering eight million federal employees. *See Id*. at 2138 (dissent by Justice Breyer). In *Empire*, it was undisputed that the statute at issue was federal in character, the program that created the statute was federal, the beneficiaries of the program were federal employees, and the premiums paid under the relevant policies were federal. *Id*. Yet, the Court concluded that subject matter jurisdiction did not exist. The *Empire* Court characterized the *Grable* decision as belonging to a "slim" category of cases as it presented a nearly pure issue of law that could be settled once and for all and thereafter would govern numerous tax sale cases. *Id*. at 2137. The Court was persuaded that the contract interpretation at issue in *Empire* was sufficiently fact-bound and situation-specific that it did not fall within the very narrow category of cases *Grable* exemplifies. *Id.*

In sum, an embedded federal issue in a state law claim will qualify for a federal forum only if federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331. Indeed, the Supreme Court has been careful not to articulate a "single, precise, all-embracing" test for jurisdiction over federal issues embedded in state-law claims between non-diverse parties. Rather, the Court has instructed that when addressing this issue, a number of factors are to be considered.

Ultimately, however, it is clear that unless a state law claim necessarily raises a stated federal issue, actually disputed and substantial, which does not disturb any congressionally approved balance of federal and state judicial responsibilities, federal jurisdiction cannot lie.  The Court believes that such is the case here.

First, the lack of a private right of action, as explained above, speaks in part to whether Congress envisioned that claims arising under a particular piece of federal legislation would properly be heard in a federal forum.  *Merrell Dow*, 478 U.S. at 812.  The federal laws at issue here are the Federal Power Act and the federal tariffs promulgated thereunder.  As Defendants repeatedly explain, they are expressly exempt from the reaches of the refund authority granted to FERC under the FPA.  *See Bonneville*, 422 F.3d at 926.  This express exemption evinces, at least at some level, congressional intent that these non-public utilities not be subject to federal jurisdiction.  This is true at least with respect to the reach of the federal agency charged with the administration of refunds pursuant to the FPA.  It bears mention that the federal judiciary is not to "engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide."  *California v. Sierra Club*, 451 U.S. 287, 297 (1981).  The Plaintiffs sought refunds from the Defendants through a FERC proceeding.  That proceeding resulted in an order for the payment of refunds to Plaintiffs by the non-public utility Defendants.  Later, the *Bonneville* court found that FERC had no jurisdiction to order such refunds based on federal law. ///

Congress has spoken that it does not intend these Defendants to be subject to governance by the federal agency charged with administration of the federal law at issue.  This Court is not free to supplement the foregoing congressional answer.  The Court finds Congress intended to limit the scope of jurisdiction vis-a-vis these Defendants in precisely this type of claim.

With respect to the substantial nature of the federal interests at stake, they do not rise to the level of warranting federal question jurisdiction.  The federal tariffs that have been incorporated by reference into the contracts at issue are to be interpreted and governed solely by California law rather than by federal law.  Specifically, the ISO tariff provides as follows: "This ISO Tariff shall be governed by and construed in accordance with the laws of the State of California."  ISO Tariff, § 20.7.  The PX Tariff provides substantially the same.  Given that the very language at issue, the contract terms provided by the federal tariffs, is to be expressly construed in accord with California law rather than federal law, the Court finds the federal interests to be considerably muted.  Any interpretation by a federal court of the language of the tariffs will only speak to how those tariffs should be construed in this state.  Accordingly, the reach of any such adjudication will not have federal reverberation.  In addition, to the extent federal interests are implicated, the state court is quite competent to apply the language of the tariffs and is certainly well positioned to do so where, as here, the tariff language is to be construed in accord with state law.

///

1    In sum, the Court concludes both that the lack of a private
2  right of action evinces congressional intent to foreclose a
3  federal forum and that the federal interests at stake are muted
4  given that the federally imported language is to be accorded
5  meaning consistent with this state's laws.  However, even had the
6  Court found the presence of a substantial disputed federal issue
7  and the ostensible importance of a federal forum, those finding
8  are not necessarily dispositive.  *Grable*, 545 U.S. at 314.  In
9  fact, there must always be an assessment of any disruptive
10 portent in exercising federal jurisdiction.   *Id.*

11   In assessing the potential disruption of the sound division
12 of labor between state and federal courts envisioned by Congress,
13 it is instructive to once again consider the seminal Supreme
14 Court cases of *Grable* and *Merrell Dow*.  In *Grable*, the Court saw
15 little danger in accepting jurisdiction of the state title
16 dispute because it would "portend only a microscopic effect on
17 the federal-state division of labor."  *Id.* at 315.  In contrast,
18 recognizing a substantial federal question when a violation of
19 federal law furnished the basis for a negligence claim, as in
20 *Merrell Dow*, would severely impact the "the concern for
21 'practicality and necessity' that *Franchise Tax Board* advised for
22 the construction of § 1331 when jurisdiction is asserted because
23 of the presence of a federal issue in a state cause of action."
24 *Merrell Dow*, 478 U.S. at 811-12.  Accepting jurisdiction in that
25 case "would have attracted a horde of original filings and
26 removal cases raising other state claims with embedded federal
27 issues" and likely would "have heralded a potentially enormous
28 shift of traditionally state cases into federal courts."

*Grable*, 545 U.S. at 319.

The Court views the circumstance presented by this case as more parallel to the paradigm expressed in *Merrell Dow* than the paradigm articulated in *Grable*.  Specifically, excepting diversity cases from the equation, the bulk of contract disputes in the United States are conducted by the state courts.  This balance would be upset drastically if state contract claims could become a matter of substantial federal interest by the simple expedient of incorporating by reference the terms of a federal law or regulation.  The Court believes such a dramatic shift would distort the division of judicial labor assumed by Congress under section 1331.

Given the foregoing concerns, and following the analytical methodology laid down by recent Supreme Court precedent, the Court finds that this state-law contract action incorporating by reference federal tariffs does not present a sufficient federal question over which this Court may exercise "arising under" jurisdiction pursuant to 28 U.S.C. § 1331.

**B.    Sparta/Dynegy Exclusive Jurisdiction Exception**

The Parties vigorously argue over the applicability of an exception to the general rule that state law claims cannot be alchemized into federal causes of action by incidental reference. *See Sparta Surgical Corp. v. NASD,* 159 F.3d 1209 (9th Cir. 1998) (citing *Easton v. Crossland Mortg. Corp.,* 114 F.3d 979, 982 (1997).

*///*

This exception was first set out in the seminal case of *Sparta Surgical Corp. v. NASD* ("*Sparta*") and later examined in *Lockyer et al. v. Dynegy, et al.* In *Sparta*, the Ninth Circuit confronted the question of subject matter jurisdiction over a variety of state common-law claims that alleged, in part, a violation of the rules contained in the Securities and Exchange Act ("Exchange Act"). 159 F.3d 1209. The plaintiffs in *Sparta* brought their claims in a state court. Thereafter, the defendants removed the case alleging "arising under" federal jurisdiction based on a claimed violation of the Exchange Act. The Ninth Circuit found federal jurisdiction proper based on the exclusive jurisdiction provision contained in the Exchange Act itself. The court explained its ruling as follows: "the rule that state law claims cannot be alchemized into federal causes of action by incidental reference ... has no application when relief is partially predicated on a subject matter committed exclusively to federal jurisdiction." *Id.* at 1212-13. The court ultimately found that the state law claims arose under the exclusive jurisdiction provision of the Exchange Act rather than under 28 U.S.C. § 1331. *Id.* at 1212.

Later, in *Lockyer v. Dynegy*, the Ninth Circuit confronted a similar case where the plaintiffs sought federal jurisdiction over a state law unfair competition claim, Cal. Bus. & Prof. Code § 17200, *et seq.*, alleging an underlying violation of the precise tariffs at issue here. 375 F.3d 831 (9th Cir. 2004). Like in *Sparta* itself, the plaintiffs in *Dynegy* brought their claim in the state Superior Court. The defendants promptly removed the action to a federal forum.

1  Plaintiffs thereafter sought remand and the Ninth Circuit, citing

2  *Sparta*, concluded the federal court properly retained

3  jurisdiction given the existence of an exclusive jurisdiction

4  provision contained in the FPA.  *Id.*

5      Plaintiffs in the present action rely heavily on the *Dynegy*

6  case.  That is, Plaintiffs rely on the Ninth Circuit's conclusion

7  that the tariffs promulgated by FERC pursuant to its authority

8  under the FPA are the equivalent of a federal regulation and,

9  therefore, an examination of those tariffs to assess the merits

10 of the present claim raises a federal question.  *See Id.* at 840.

11 Plaintiffs further contend that this case is analogous to *Dynegy*

12 where the Ninth Circuit plainly found federal jurisdiction

13 because, as in *Dynegy* itself, here the merits of the claim turn,

14 in part, on an examination of the tariffs.  Defendants contend,

15 rather convincingly, that the *Dynegy* case is distinguishable from

16 the case at bar.  The Court agrees.

17     As an initial matter, the *Dynegy* plaintiffs were seeking

18 relief on the ground that the defendants violated California's

19 unfair competition law.  *See Cal. Bus. & Prof. Code* § 17200 *et*

20 *seq*.  Generally, that law proscribes unlawful business practices

21 by borrowing violations of other laws and treating them as

22 independently actionable under Section 17200.  *Cel-Tec Commc'ns,*

23 *Inc. V. L.A. Cellular Tel. Co.,* 20 Cal. 4th 163, 180 (1999).

24 Accordingly, an essential element of the *Dynegy* plaintiffs' claim

25 was, necessarily, a violation of the federal tariffs themselves.

26 Absent such a violation, no state law liability could have

27 survived.

28 ///

1  Given that fact, it is no surprise the court concluded the relief

2  sought was predicated on a matter committed exclusively to

3  federal jurisdiction because the state lawsuit turned "entirely[]

4  upon the defendant's compliance with a federal regulation."

5  *Dynegy*, 375 F.3d at 841.

6      Here, in contrast, the Plaintiffs are seeking to enforce a

7  private contract between private parties which will afford relief

8  only if the contract terms, from wherever drawn, are found to

9  have been breached.  Unlike in *Dynegy*, it is not the federal

10  tariff itself, standing as the law, that will give life to the

11  merits of Plaintiffs' claim.  It is the contract language,

12  standing only as a representation of the agreement between the

13  Parties, that will inform the resolution of this matter.

14      While the Court believes the foregoing to be the correct

15  analysis of the jurisdictional issue at bar, an argument may be

16  advanced that the subject matter of the contract, i.e. the sale

17  of Energy from the Defendants to the Plaintiffs, is the exclusive

18  domain of federal jurisdiction irrespective of the sweeping

19  exception for these Defendants.  At first blush, this averment

20  appears meritorious.  Indeed, a broad reading of the *Dynegy* case

21  arguably supports this argument to the extent that *Dynegy* finds

22  an interpretation of the federal tariffs at issue a matter

23  committed exclusively to federal jurisdiction.  *See* 375 F.3d at

24  843.  However, the Court finds the later decided *Bonneville* case

25  dispels the notion that the broad grant of authority under the

26  FPA's exclusive jurisdiction provision ensnares all matters,

27  however arising, respecting the sale of Energy.  *See* 422 F.3d at

28  916.

To be sure, the FPA applies to "the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale."  15 U.S.C. § 824(b).  More importantly, however, the FPA provides:

> The District Courts of the United States ... shall have exclusive jurisdiction of violations of this chapter or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this chapter or any rule regulation or order thereunder.

16 U.S.C. § 825p.  In contrariety, the FPA provides the following exemption:

> No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, or any agency, authority, or instrumentality of any one or more of the foregoing,...unless such provision makes specific reference thereto.

16 U.S.C. § 824(f).

The *Dynegy* plaintiffs sought to directly enforce the federal tariffs as they applied to public utilities.  Based on the exclusive jurisdiction provision, the court found relief was "predicated on a subject matter committed exclusively to federal jurisdiction."  375 F.3d at 841 (citing *Sparta*, 159 F.3d at 1213).  Later, in *Bonneville*, the court was tasked with interpreting both the foregoing jurisdictional provisions to determine if the federal commission tasked with implementing the FPA could, as a matter of jurisdiction, order non-public utilities to refund sums allegedly overcharged.

///

///

///

24

1  The *Bonneville* court made clear that while the subject matter of
2  wholesale sales of Energy under the FPA is committed to FERC's
3  exclusive federal governance, the more narrow exclusionary
4  provision carves an exception to that general authority to govern
5  the sale of Energy at least with respect to these Defendants.
6  *See* 422 F.3d at 916.  That holding indicates to this Court that
7  the subject matter, as it applies to these defendants, is not a
8  matter committed exclusively to federal jurisdiction pursuant to
9  15 U.S.C. § 824(b).  Instead, federal jurisdiction in this case,
10 if any, would necessarily have to exist under 28 U.S.C. § 1331.
11 As explained in Section I.A. supra, the Court has already
12 determined this matter does not satisfy the factors giving rise
13 to jurisdiction thereunder nor does it meet the exception set
14 forth in the *Sparta/Dynegy* line of cases.

15 Finally, the exclusive jurisdiction provision of the FPA
16 provides that the District Courts shall have jurisdiction over
17 violations of the FPA, and of all suits in equity and actions at
18 law brought to enforce the FPA or the rules promulgated
19 thereunder.  These Defendants are simply not subject to the
20 relevant provisions of the FPA as a federal regulation.  Rather,
21 these Defendants may only be bound to comply with the language of
22 the tariffs purely as a matter of contract law.  On that same
23 note, this is not a suit alleging violations of the FPA itself or
24 of any rule or regulation thereunder.  Instead, this is a suit to
25 enforce a contract between private parties that has merely
26 incorporated by reference terms that are contained in a federal
27 regulation.
28 ///

1    In sum, to the extent FERC has no federal authority to order

2 refunds of these Defendants, Plaintiffs seek to substantively

3 characterize the contract terms as federal in character so as to

4 trigger federal question jurisdiction.  Simultaneously, however,

5 to the extent garden variety contract terms do not give rise to a

6 federal question, Plaintiffs seek to jurisdictionally

7 characterize the tariffs as "federal regulations."  The Court

8 finds these positions to be inapposite.  Either, the tariffs

9 incorporated by reference into the contracts at issue are drawn

10 from and have their force under the FPA, in which case Congress

11 and relevant case law have indicated there is no federal

12 authority to enforce these tariffs against these Defendants (*See*

13 *Bonneville*, 422 F.3d 908); or, the tariffs are merely garden

14 variety contract terms incorporated into a private state law

15 contract, in which case there is no federal question (*See Empire*,

16 126 S. Ct. 2121).  In either event, federal jurisdiction is

17 wanting.  Accordingly, the Court hereby grants the Defendants'

18 Motion to Dismiss based on a lack of federal jurisdiction.

19

20    **C.   Diversity Jurisdiction**

21

22    There are three Parties to the present action that are

23 arguably non-diverse.  Accordingly, as to those three Defendants,

24 the lack of federal question jurisdiction would not be fatal in

25 and of itself as jurisdiction could arguably be based on

26 diversity.

27 ///

28 ///

The principal federal statute governing diversity jurisdiction, 28 U.S.C. § 1332, gives federal district courts original jurisdiction of all civil actions "between ... citizens of different States" where the amount in controversy exceeds $75,000.  28 U.S.C. § 1332(a)(1).  The statutory formulation "between ... citizens of different States" has been construed to require complete diversity between all plaintiffs and all defendants.  *Lincoln Prop. Co. v. Roche*, 546 U.S. 81 (2005) (citing *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996).

In the present action, fifteen (15) of the seventeen (17) Defendants in this action are citizens of the State of California while the remaining three (3) are not.  Accordingly, complete diversity does not exist and jurisdiction cannot, therefore, be conferred as to any of the remaining Defendants.

**CONCLUSION**

For the reasons set forth above, the Defendants' Motion to Dismiss based on a lack of subject matter jurisdiction is GRANTED.

IT IS SO ORDERED.

Dated: March 16, 2007

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

27